We're happy to hear argument in our next case, United States v. MacDonald as soon as the lawyers are ready. Please be seated. May it please the court, my name is Joe Zasatarsky, I'm a lawyer in Raleigh, North Carolina, and I represent the appellant, Dr. Jeffrey MacDonald, in this matter. This is an appeal of the denial of Dr. MacDonald's 2255 motion based on newly discovered evidence of two types. Number one, new DNA evidence. Number two, evidence relating to the key defense witness at trial, Helene Stokely. This trial occurred back in 1979, and where I'd like to start is on the direct appeal of this case in 1980. In 1980, this court said that had Helene Stokely testified as had been expected by the defense, that is, that she was present during the murders, the injury to the government's case would have been, quote, incalculably great. That's what this court said in 1980. That's murder handling. That's correct. And I believe that sets the context for this appeal in two ways, because that means two things. Number one, it means that Helene Stokely was a very important, if not the most important witness in the trial. Number two, it necessarily means that the government's trial evidence was not strong, because if Helene Stokely had testified in that manner, and the damage would have been incalculably great, that necessarily means that the government's theory, which was a deduction from the physical evidence at the scene, was not a strong case. That's the context that was set. The district judge here in the Habeas proceeding said it was strong. He did. He did. But that's the part that's on appeal. Correct. His characterization of it as being strong. And there are three areas of the district court's order that I'd like to talk about that we would submit are incorrect. And one is that, the district court's acceptance of the government's argument that this was a strong case at trial. Number two is its treatment of the DNA evidence. And number three is its treatment of the Stokely evidence. Well, I don't really think I understand your first argument, because the court is making its own assessment. It doesn't have to be dealing with anybody else's prior assessment of how strong or not strong the evidence was. There is, I would say, a substantial amount of physical evidence here. And so whether Ms. Stokely was going to be the most persuasive witness or not, there was still a wealth of actual physical evidence. Well, Your Honor. You know, I mean, you can make that argument, but I would think you would be more, I mean. Well, Your Honor. A judge's opinion is just as good as the last judge that looked at the case. Well, sure it is. But I would make a couple points about that, Your Honor. First, the government's argument below, and its argument in this brief, is one based on inference from the physical evidence. To read the government's brief to this court, it's all inferences. And it's treating this as if it were a direct appeal, that it was entitled to those inferences. But it's not on this appeal. On this appeal, the law is, and in fact the district court had to, under the standards set by this court in the appeal in 2011 of this case, look at the evidence and assess its credibility and likely reliability. And what's the rest of that? Well, that's the standard as to the evidence. Okay. The no reasonable juror standard is the 22H standard that we're appealing. Okay. Well, but that's the standard that applies. It is. No reasonable juror could convict on this evidence. Correct. All of the evidence. That's a tough standard for you. The newly discovered evidence in light of all the evidence. That's a tough standard for you. It's a high standard. But it's in the evidence as a whole. The evidence as a whole. And that's why this first point is important, that the government's evidence at trial was not strong, because it's a continuum. If the government has presented a strong trial case, we would necessarily need more evidence to overcome it. When did you get this letter of Judge Dupree? Judge Dupree's letter. I figured you'd carry it up there with you. But you didn't have that in the previous appeal. We did not. All right. That just came up since then. But he wrote that letter to the young woman who was working for the defense lawyer, Mr. Smith, as a lawyer, and he thought that Judge Dupree had thought about hiring her as a law clerk. Correct. And he wrote to her and said, I can't hire you. After the conviction, he wrote and said, I don't think I ought to hire you now because it's on appeal. When I was thinking about that, I didn't think it was going to be a guilty verdict. I confidently expected the jury would return a not guilty verdict. But Judge Fox looked at it independently and said it's a strong case. Well, interestingly. And that's the opinion that's on appeal, Judge Fox's opinion. And what difference does it make what either one of them said? We're looking at it. Correct. Well, then go and tell us. Instead of worrying about who said whether it's strong or not, show us it's not strong if you don't think it's strong. Well, Your Honor, in docket 343, which is the defendant's post-trial, post-hearing memorandum, it lays out the trial evidence and it lays out why the government's theory is wrong as to each piece. For example, the government relied on this pajama-top experiment. We call it a demonstration. It was an experiment at the trial about the thrusts of the knife. You can be sure we know the record. And we certainly, in our view, we've disassembled that. We've shown that it's really an experiment. They rely on the physical evidence from the scene, which fibers are where. The jury convicted. Yes. Now you have some additional evidence. Correct. You want us to put it in with all of the evidence on which the jury did rely in convicting. Correct. So it seems to me that maybe you want to focus on that new evidence and how it affects. The new evidence comes in two parts. Number one is the DNA, the 91A hair, which is under the fingernail, in the fingernail scrapings of Kristen McDonald, one of the two young children. There's no root. There's no evidence that this was extracted involuntarily. Correct. Is that right? The evidence is the affidavit from the government that it was a naturally shed hair. However, as we set out in our reply brief, the fact that it is a naturally shed hair doesn't mean anything because the government's own expert in that affidavit says that a naturally shed hair could be shed during contact with someone. This little girl had defensive wounds on her hands. She was clearly struggling with her attacker, and this hair is not in her hand or on her hand. It's in the scrapings under her fingernail. So it easily could have come out when she was struggling with her attacker. The fact that there's a root there or not a root there, we would submit, doesn't mean anything. I bet if there was a root there, you'd think it meant something. It would be stronger, certainly. It would be stronger. But the government's argument that a root there means that it's weak, we would submit, doesn't carry any weight because the government's own expert concedes that that hair could come out during contact. It could, but didn't the district court find that it also could have come from other places because there's no root. The issue with the district court's order is it never discusses the point that we raised, which is the location of that hair. It says that the hair was found in a vial that included the fingernail scrapings. So I think the district court had in mind that it might have come from the fingernail. But there's no explanation. Again, the only explanation for how that hair could be in a fingernail scraping, again, under the fingernail, we have to assume scrapings mean exactly what the word says, which is that during the autopsy they scraped under the fingernail, and this hair is in the vial from those scrapings. You're saying it was under her fingernail. Correct. And the location of it. The district court in its order never talks about how the fact that where it is is so exculpatory. That's the issue. Where does the government say it was? Interestingly, the government now claims that the testing has come back exculpatory. The government claims that somehow it's not part of the fingernail scrapings and that somehow it got into this sample, which is, in essence, an argument that they contaminated their own hair. Is that a position that they took with the district court, or is that a position they just took on appeal? That's a position they took in the district court after the testing was returned. Prior to the testing being returned, the government, even in its own briefs, said that this hair was part of the fingernail scrapings. So is it your view that if the hair came from under the fingernail, there's no way it could have gotten there except through struggle with an attacker? I read the district court differently. It was saying, effectively, I don't know where it came from, but it doesn't really make any difference because the hair can get anywhere. Well, yes, because of the location. You think there's no way it gets under a fingernail unless it's the result of a struggle with an attacker? Lodged under the fingernail, and it's there during her autopsy. But doesn't science tell us that you pick up this stuff and you don't know where you pick it up? I mean, that could have happened. It could have been with her attacker, or she could have gotten it from playing in the rug and there was another child over that day, and she picked it up. You know, we just don't know. Or another day, or earlier in the week. Could have gotten it at school, a week before that. I mean, we just don't know, do we? Well, what we do know is it's there at the time of her autopsy. Right. That's what we do know. And we would submit that that, given the location of it, that that is highly exculpatory. Could the argument be made by the government to try to explain it away? Absolutely, they could. Well, but it's not as if you have this hair tied to some other person of interest, right? Correct. Because, recall with the testing, the testing was against Dr. McDonald, the family members, Ms. Stokely, and Mr. Mitchell. Those are the people of interest here. Correct. If it was Ms. Stokely, you'd have a lot better argument. Exactly. But remember, Dr. McDonald said that there were four people who came into the house. Not two, four. So there is that issue as well. I'd like to talk a little bit, before my time runs out, about the Stokely evidence and the evidence in that regard. Is that the same as the Britt claim? The Britt claim, correct. That's part of the Britt claim. And with respect to Ms. Stokely, at the hearing, originally at the trial there were seven witnesses who would have testified to Ms. Stokely making confessions to them. There are now up to 12, depending on how you view the evidence. And this court on appeal found that the district court was within its discretion in excluding the evidence at that time. Now we have 12. Can you just explain to me if the underlying concern is that Stokely herself is not reliable, that Stokely's statements are not reliable or credible, why does it matter to how many people she made those statements? Because of who she made them to. She confessed to her own lawyer. But if you think, if the premise, and I gather this was the premise of excluding those witnesses originally, is that Stokely herself is not credible. She is erratic. And so one cannot trust what she says. I'm not understanding why it matters to how many people she made an erratic statement. Because, Your Honor, the new evidence shows that in fact her statements, that she is reliable with respect to Stokely. Okay, how do they show that? In two ways. Number one is she confessed to her own lawyer. Why would she inculpate herself to her own lawyer if it weren't true? How is her own lawyer different from her own mother? Why would you inculpate yourself to anyone if it weren't true? You think it's less likely. I think it's less likely that you're going to tell your own lawyer that you're guilty when you're trying to get legal advice. And, in fact, there are numerous cases. Isn't the premise sort of that she's not really thinking critically and rationally? Well, that's the premise. But, again, our position would be that's for the jury to decide. And at some point you reach a point where the jury should hear this evidence. At some point you reach that point. You can't just be arguing that the jury should hear it and that maybe it would make a difference. You have to be arguing that any jury, no reasonable jury, having heard the evidence that this erratic and non-credible woman had confessed to her lawyer could actually discount the confession and vote to convict. And I think this court said that in 1980 when it said the damage to the government's case would be incalculably great had she testified to being present in the House. And it ties in also, Your Honor, with Wendy Rauter's testimony about she has this discussion with Stokely in the days after her trial testimony where Stokely said she couldn't remember only the four hours. But Stokely has passed away. Correct. I mean, if you had a new trial, you'd face an array of hearsay objections to any of this stuff. And, again, the issue would be whether these would be admissible under the statement against interest exception to the hearsay rule. Which was the same issue on the direct appeal. That was the same issue. Ms. Rauter's testimony was that in the days after Stokely's testimony at trial that she came to her and said that she was present. And it didn't come in on the trial. And that's what Judge Bernahan was talking about. If those other seven witnesses had testified, it might have been a different situation. But the other seven witnesses didn't testify because it was hearsay. And now you've got 12 witnesses, but you've still got the hearsay problems. And Ms. Stokely's not available. She's passed away 30 years ago or something. But, Your Honor, we have an explanation for why Ms. Stokely said that she couldn't remember the four hours, which is the evidence relating to the break. There's no statements or testimony from her that she gave under oath that's preserved anything, right? Other than her trial testimony. Other than her trial testimony where she said she didn't remember anything. That's correct. That's correct. There's nothing where she says what you would have liked for her to say. The evidence we have now. And Mr. Britt, the marshal, Deputy Marshal Britt, his testimony may have helped you, but his testimony wasn't preserved either. He's passed away. He passed away before he could testify at the hearing. Correct. All we have is his affidavit. Yes. But his affidavit tied in with Ms. Rauter's testimony explains why, in our view, as we set out in the briefs, why Stokely said she couldn't remember, which is the threat from AUSA Blackburn. Rauter's testimony is that when she asks, when she says to Stokely, well, you're telling me this. Why didn't you say this three days ago on the stand? Stokely says, quote, because those damn prosecutors. Is Ms. Rauter the lawyer, the judge? Correct. Dupree wrote the letter. Dupree wrote to her. Okay, yeah. Who he wrote to. And those two things tie together, in our view, to explain it. Is she still practicing law there, Raleigh? Is she still around? She actually was an assistant to Mr. Siegel from San Francisco, and she's still out in San Francisco. All right, okay. Yes. I see my time is up, and I'm happy to answer any other questions. But we would ask the court to reverse Judge Foster's ruling. We'll hear from you on that. Thank you. Thank you. May it please the court. I'm John Bruce. I'm the United States attorney in the Eastern District of North Carolina. I represent the United States in this case. In 2011, this court remanded the case to the district court and asked the district court to make a more searching assessment of McDonald's Fifth and Sixth Section 2255 claims, using an expansive view of the evidence as a whole to see whether the claims met the gatekeeping standard. The district court followed this court's instructions fully. It allowed McDonald's to introduce literally anything he wanted to introduce. The district court blocked out two weeks for an evidentiary hearing. The parties used seven days. Forty years' worth of documents were put into the record. Voluminous filings for a year after the hearing. We were briefing it, 337 pages total of briefs. McDonald added more documents in those. And the district court has reached the conclusion that the gatekeeping standard was not met. This court in the remand noted that on remand, McDonald would face a daunting burden and that the gatekeeping standard was designed to ensure that the standard would only be satisfied in the rare and extraordinary case. And of course, this court asked the district court, as the law requires, to make assessments of the likely credibility and probable reliability of the proffered newly discovered evidence. The defense spends a lot of time on its view of the evidence as a whole. But I think the most important thing is to look at the newly discovered evidence that got McDonald back into court in 2006, the Jimmy Britt allegations and the so-called unsourced hair allegations. With respect to the Britt claim, the district court found properly that the end result is that the court cannot find any of Britt's statements to be likely credible or probably reliable. The court said further, attributing these major inconsistencies, and that means inconsistencies among the various statements of Britt, there were four or five of them, and also inconsistencies with the rest of the evidence. Now, do we defer to the district judge on that point? Yes. On the credibility issue? Yes, Your Honor. Reliability issue or whatever you want to call it. We submit that that is a paradigmatic factual issue of assessing credibility and reliability that the district court has made. Yeah, but the witness isn't in front of the district court, right? Well, there were a lot of witnesses in front of the district court. No, no, no, we were talking about the Britt. Well, it's true that Jim Britt was not live before. Well, usually when we defer to the district court, it's because the district court is there to assess the witness. The district court couldn't anymore assess the witness that is assessing the witness on the paper record. We can look at the paper record as easily as the district court can. Well, I submit, Your Honor, that there's more than the paper record that the district court considered in assessing the credibility of Britt and the other credibility judgments it made. There were live witnesses that testified at the evidentiary hearing. For instance, Dennis and Janice Meehan testified live to say it was they who brought Helena Stokely from South Carolina to Raleigh during the trial and not Jim Britt. Also, you had the supervisor of Jim Britt, the chief deputy, Eddie Sigman. But they didn't talk about the conversation that he overheard with the prosecutor and Helena Stokely. No, but... No, but did you have anybody on that? Yes, we had two witnesses on that. We had Jim Blackburn, who's the man who was accused of doing it, and we had Jack Crawley, who was present in the room. And Blackburn, he had been convicted of something. Jim Blackburn, about 11 years after he left the U.S. Attorney's Office. Yeah, I mean, he had the impeaching material against him. You didn't have anything like that against Britt. But the judge didn't hear Britt, the point. The judge heard people who knew something about Britt or may have heard Britt say something, but he wasn't able to assess Britt's credibility from seeing him on the witness stand. It's the likely credibility and the probable reliability of the evidence. I understand all that, but assessing credibility of a witness, we defer from district judges because they look at the witness. Judge Wagner, you say they looked him in the eye. They could figure out whether they're telling the truth or not. That didn't happen here with Jim Britt. Jim Britt was not face-to-face with Judge Fox. That's true. And he was. But his statements... At one point when he was sick, I thought, I remember from the last case, there was something about, in the record, about somebody wanted to preserve his testimony because he was sick. Was that ever... That's not quite right, Your Honor. Well, I'm saying I didn't say it. I wasn't very specific about it. I just begged him to recall something about whether his testimony was sought to be preserved, and it wasn't. It was not. It was not sought to be preserved. Was it sought to be preserved? No, it was not sought to be preserved. It was never sought to be preserved. It was never sought to be preserved. All right. What the court is thinking about is that the attorney for Jeffrey McDonald at that time, Hart Miles, wrote a letter to the court on September 7, 2007, and he indicated that Jim Britt was having heart problems, and he said that he wanted to notify the court that it now appeared that Mr. Britt's availability for any sort of court proceeding is doubtful. He didn't ask for any relief. He just wrote the letter. When we had the status conference after the remand in September of 2011, this was discussed, and Judge Fox pointed out, you didn't ask to take any depositions. You didn't ask for any discovery. You didn't ask to preserve his testimony. But in these circumstances, then, going back to whether we defer, I think probably we don't, because under the circumstances that you've revealed, we're just as able to look at what's in writing here as Judge Fox was. Well, Your Honor, I just respectfully disagree. Your submission is that there are other witnesses that you did produce before Judge Fox that suggested that this witness was not credible, and I guess one of those witnesses was Blackburn, right? Now, how are we to credit Blackburn? Look. Because he's barred. The reason. I'm sorry. Just let me finish the question. I'm happy to have your answer. I'm sorry. So do we have to credit Blackburn's testimony to find the Britt affidavits not credible? No, Your Honor. And we realized that going in, and that's why we did such a thorough investigation of Jim Britt's claim, so that we would not have to rely just on Jim Blackburn's denial of what he was accused of. He did deny it, of course. But let's look at what the Britt claim is. Not the credibility of Britt in the abstract, but the credibility and reliability of what he claimed. When McDonald filed this in 2006, this is what McDonald's own pleading said. It said, First, she, Helena Stokely, confided in Deputy U.S. Marshal Jim Britt while on the long five-hour journey from Greenville, South Carolina, to Raleigh. The pleading went on. In the presence of Jim Britt, to whom she had already confessed and apparently developed some trust, and in the office with Blackburn, she allegedly confessed. It's all based on this alleged transportation of Stokely from South Carolina. That's what Britt's affidavit. There were several, but the one they chose to attach to their 2255 said this. The affidavit of Britt, During the course of the travel from Greenville, South Carolina, to Raleigh, Helena Stokely told me about a hobby horse in the McDonald home and that she, in fact, was there on the night of the murders. Then he said, this is the only way he described what happened when Stokely talked to Blackburn. He said, Britt, in the affidavit, said, Ms. Stokely told Mr. Blackburn what she had stated to me on the trip from Greenville to Raleigh. He never transported her. That was proven beyond any doubt. Burden of proof, of course, is on McDonald's. He transported her to court. However, before the prosecution interviewed, he was in her presence. The only evidence we have of him being in her presence was a five-minute, six-block ride from the Wake County Courthouse to the Raleigh Federal Building. There was also evidence from several witnesses, live before Judge Fox, that it would not have been the practice to have a deputy marshal sit in on an interview like that. The, as I said, Chief Deputy Sigman, who was Britt's supervisor, said that he was an attention seeker. The U.S. marshal that supervised him a little bit later in his career said that he was short on veracity. And in the joint appendix, 3731 through 3748, there's a list of about 20 assertions that Jim Britt made in his various affidavits that are indisputably false. And some of them are bizarre. He said that upon arrival back in Raleigh from South Carolina, he took Stokely and her boyfriend to the Holiday Inn and checked them in. Stokely was a prisoner on a material witness warrant. She didn't get checked into any hotel when she was brought from South Carolina to Raleigh. Excuse me, I've got to dry my mouth today. I don't hardly know which one of these to pick out to tell you. There's so many of them. You can be sure that we have read the record. Okay. I think that your general submission here is, okay, we didn't have the witness in the court, but the government gathered various pieces of evidence which the government suggests that the witness is not credible. Correct. I still think it's not the witness is not credible, but this claim is the newly discovered evidence. But you all attack not just Britt, you attack these two lawyers that testify. You say they're made everything up too. Mr. Leonard, for example. Mr. Leonard, yes. I don't say that we attack everybody for lying. You don't attack Jerry Leonard? You do? We do. Not for lying, but for evidence. He's a reputable lawyer. He was a law clerk to Judge Dupree. He was a law clerk to Judge Dupree. That's correct. That's how he got into this. He just got into this as somebody called him in the middle of the night and said this woman up here needs a lawyer. Called him on a Sunday afternoon. A court-appointed lawyer. That's correct. Then he ends up on the end of your all's attack because he got on the wrong side of this case. Well, let me see if I can explain that, Your Honor. The district court found, in sum, the court respectfully finds that Leonard's testimony is not likely credible nor probably reliable. He testified 33 years after the events with no notes and no documents. Strictly from recollection. Here's what Jerry Leonard himself said about his testimony during his testimony. He said, you know what happens is you find out stuff later and then you confuse that with what you actually knew at a particular time. Which, of course, is true. It is true. Leonard doesn't assert that's not true. And he went on to say, and what happens is you hear stuff at a later date and it all becomes part of what you know and it's hard to peel away the context you heard one thing from the other. But what's wrong with that? I think he was admitting to the poor memory. Well, he was qualifying what he said. He was stating he was talking about something that happened 33 years ago. Well, I think Judge Fox was quite correct to say that he had a poor memory on this matter, very poor memory, and that it was plausible that he was mixing up what he'd later learned with what had happened. Well, he might have been. But I couldn't understand why the government just went after everybody hammer and tong as if they're scoundrels because they're on the wrong side of the courthouse or the courtroom or on the witness stand. I mean, it just didn't make sense to me. I want to explain that we didn't say that everybody was lying, but I just would like to finish with Jerry Leonard before we leave it. Jerry Leonard himself said, he admitted he made this statement, that he said, honestly, my memory is not 100% and for anything I say to be reliable as I'm trying to fill in the facts for you, it's fairly dangerous. Honestly, I think I'm wrong on some key facts. And boy, was he. He couldn't. Well, then he told you what the facts were and then you say he's wrong on the key facts. He said he gave his best memory. It looked to me like. I read it, too. The record. And he qualified it and stated the facts. Then you all attack him. The record. As if he's a scoundrel. I mean, I've been a court-appointed lawyer, too. Nobody wants to get into those situations. Somebody has to serve the court. Not everybody is the United States attorney or the assistant United States attorney or the prosecutor. I understand, Your Honor. Lawyers have to take unpopular clients and do the best they can. I understand that, Your Honor. His testimony just did not fit the contemporaneous record of what happened. For instance, he said that he did not talk to Wade Smith, counsel for Jeffrey McDonald, during the trial. He said that emphatically. I feel sure I didn't talk to Wade. He said he didn't recall having any contact whatsoever with the defense. Well, right, and Wade Smith's credibility is unimpeachable. He testified at this hearing. We don't think anything he said was at all false. In fact, we think a lot of what he said helped the government, especially about the defense interview of Helena Stokely. Here's what the transcript says actually happened at the trial, because Wade Smith told this to Judge Dupree on August 23, 1979. I talked to Jerry Leonard at great length, Your Honor. Talked to him for a long time, and this woman, Helena Stokely, continues to say things that tie her to this case. She is here. The defendant is on the stand, and we feel that we need to be able to talk to Jerry and at least have her available this afternoon. Just a few months after the trial, a defense investigator interviewed Jerry Leonard, put it down on paper, and said that Mr. Leonard stated that he got permission from Ms. Stokely to discuss things with Wade Smith during the trial, and that he had a conference with Mr. Smith and told him what Helena told him, and he also stated that he gave Mr. Smith some insight and his impressions of Ms. Stokely. The defense, getting all this information during the trial from Jerry Leonard, chose not to recall Helena Stokely. She had testified for four and a half hours on Friday, August 17th. She remained in Raleigh as a defense witness for the rest of the next week, subject to recall, and they chose not to recall her. So I submit that, and there are other things. He told this story about taking her to his house and letting her sleep on the couch because he was responsible for her lodging. He wasn't responsible for her lodging. Counsel, can I just ask you, if I'm remembering right, the district court did say that, I'm agreeing with you, that Leonard's testimony was, that he had a faulty memory. But didn't he also say at the end of the day, I don't really care whether Leonard was credible or not because Stokely was not credible, and so even if everything happened as Leonard says it happened, I don't think it makes any difference because Stokely is not credible. And that's a valid way to approach it, Your Honor. But our litigation position was, the reason we were so strong on this is because this just did not fit with the contemporaneous record of what had happened. I know, but isn't it possible that if you're looking back 33 years, you get some details wrong, but the thing you are most likely to remember is, oh my God, my client just confessed to a mass murder. I mean, isn't, that seems to me like something that might stick for 33 years, whereas who exactly you told and what building you were in might not. Well, Your Honor, I submit that one important, very important detail when you're appointed to represent a client after they've just testified four and a half hours is whether or not they had testified or whether or not they testified before the jury. He was mixed up on that. Well, he might have been mixed up on that. Lawyers normally also don't end up testifying as to what their clients told them. There's a thing called the attorney-client privilege, and here it was taken away from him. That's right. They ruled that he couldn't assert the attorney-client privilege or it was overruled, the assertion of it, and he had to testify to what his client had told him. Normally, it's inviolate. I mean, in a lot of places, lawyers get disbarred for revealing what their clients told them. Well, the government urged the court to take that position because of a footnote in a Supreme Court case that said there might be an exception to attorney-client privilege when the client was dead and the evidence might be held. Well, I understand all that. We wanted to get it right. I read a little bit of that law, that Berlin case, but it's an exceptional situation, and this may have been appropriate, but it's a very exceptional situation that a lawyer's on the witness stand testifying to what his client said, particularly about participating possibly in a mass murder. We had no quarrel with, for instance, what Wendy Rauder had... Wendy Rauder testified at length at the voir dire in 1979 in the trial based on notes that she'd made the previous day, and we didn't challenge any of that. She didn't have an attorney-client privilege with this woman. I understand she did not. I understand... Leonard had an attorney-client privilege with her. I'm just trying to point out, Your Honor, that we didn't argue that everybody was lying. That you didn't say everybody was lying. Correct. But I guess I don't understand sort of the structure of your argument, why this is your litigating position, because you have to embrace the theory that Stokely herself was not reliable, don't you? Because the district court didn't say that the mother, that Stokely's mother was not credible or reliable. The district court was prepared to credit her testimony that Stokely had confessed, but that was not a problem, the district court said, because Stokely is not reliable. So you kind of have to embrace the Stokely... the source is not reliable, and given that you have to embrace that, what's the big deal about Leonard? Well, if the court takes that approach, we're fine with that.  Otherwise, what do you do with the mother? Well, the same thing that we've said about everybody else, that if you want to look at the most reliable evidence, look at what was said contemporaneously. But the district court did not agree with you on that. The district court said, I'm not saying the mother's not reliable. I'm saying Stokely wasn't reliable when she talked to her mother. So you want us to reverse the district court's understanding about the credibility of the mother? I think the issue, again, is not the credibility of the person, it's the credibility of the evidence, the statements. The most credible statements that Helena Stokely's mother made, which were recorded in a book and testified to by the person that heard them at the evidentiary hearing, what she said in 1979, and what she said in 1984. And she said at those times that she didn't think her daughter had anything to do with it, and that she'd been pressured and abused by people working for the defense. What I think that's more credible than an affidavit she signed that was partially prepared by the defendant's wife in a nursing home when the woman was very ill. That's not what the district court said. Well, the district court said I guess it didn't have to decide that what she said in 2007 was not accurate. I grant the court's point on that. Do I have time to address the hair? Why don't you take two minutes and I'll ask the clerk to get your colleague. You're not going to get more time. I understand. The hair was not proved to be discovered. 91A was not proven to be discovered at the autopsy. None of the two professionals that were at the autopsy noted the presence of a hair. They gathered fingernail scrapings from the left hand of Kristen McDonald. They put it in a paper receptacle and put it inside a vial that looks like a pill bottle. They also put in a ruled piece of paper that had a sentence describing what it was. That was sent to Fort Gordon to the CID lab. On March 9, 1970, the paper receptacle was taken out of the vial. The fingernail scrapings were examined by Browning. He didn't find any hair. He only found a fiber that he later compared successfully to a fiber from McDonald's pajama top. He gave the paper receptacle with the filings to a lady named Janice Glisson. She noted no presence of a hair. She tested it for blood. It was positive. It was too small a sample for typing. That was the end of the scrapings. That was the end of the paper receptacle. So how did the hair get into the vial? No one knows. Well, isn't this a huge problem for you? You can't do a chain of custody like that? No, Your Honor. I think it's a huge problem for Jeffrey. It shows up in your vials and you don't know what it is or how it got there? The vial went back to Fort Bragg, was shipped back to Fort Gordon with a lot of others. It wasn't some kind of central piece of the case. And in July, when it was opened for at least the second time, all that's in there is a piece of ruled paper and the hair. And the hair, the lady's being conscientious. She doesn't know whether it's got a good chain of custody or not, but she puts it on a slide and nobody can make a microscopic comparison much later. Was it in custody of the CID all the time? Or was it at the hospital at Fort Bragg? Where was it? Once the people who did the autopsy did what I described, it was in CID custody all that time. But it had been opened. It was always in CID custody. That's correct. And they say, well, but if you got that messed up, that one hair, well, that impeaches all your scientific evidence at the trial. How do you get around that argument? Well, we submit that's completely wrong because when a piece of evidence is introduced, it stands out. Well, in the nine years between the criminal activity and the trial, I mean, how many times is there stuff back and forth at Fort Gordon and Fort Bragg and everywhere? When a piece... It sounds to me like he's got a pretty good point. If this hair's messed up in custody, all of it's potentially messed up. When a piece of evidence is introduced, it is that piece of evidence's provenance in chain of custody, not everything else that's crucial. There was no discussion or testimony about this hair at the trial, none whatsoever. Only when it became significant, well, let's look at it. Let's look where it came from. And it was not bloody. If it had been in the fingernail scrapings, it would have been bloody. The district court properly found that all three of the unsourced hairs were not exculpatory scientific evidence and that they were just as more likely to be debris than left by the intruders. Just like all the other material, this was a busy apartment with a young family living with scores of others around them. People were in and out. For instance, this really makes the case, I think, for us. And, by the way, the burden of proof's on him now. At trial, we had to prove chain of custody. The burden of proof's on McDonald to prove what he claimed in 06, which was that these hairs were bloody, forcibly removed, and in the case of the 191A, came from under the fingernail. And he didn't prove any of it. In fact, we proved to the contrary. There was a dog hair on Kristen's bedspread along with the other hair. Is that evidence of intruders? The McDonalds did not own a dog. So, obviously, a dog had been in from somewhere else in the complex, had been in that room, and likely a human being connected to that dog. How much rides on where that hair came from? If we assume for a minute that it came from under the fingernail, is that crucial to your case, just to destroy your case? I think it helps them a little bit that it came from under the fingernail, but not much. And I think Judge Harris touched on that when the defense was talking. These hands were not bagged at the crime scene. They were covered with blood. They could have picked up a hair anywhere. And, you know, this case is replete with, at trial, the jury knew all about all these unidentified things, things that couldn't be matched to the McDonald family, like fingerprints, candle wax, fabric, and a hair. In fact, there was a hair that nobody could microscopically compare at the time of the trial, and it was in the left hand of Colette McDonald. And the defense argued that was evidence of intruders. The government said it's just debris. It turned out in the DNA test to be Jeffrey McDonald's hair. So you're right, Judge. I don't think it would make it exculpatory to the degree to meet gatekeeping if it had been under the fingernail, but it helps a little bit. And he did not prove it came from under the fingernail. So that's why it was not scientific exculpatory evidence. Thank you very much. Thank you. We ask that you affirm the district court. Thank you. I submit that what Mr. Bruce just said to you about the physical evidence is fairly extraordinary. He's saying that CID corrupted some of the government's own evidence. He talked about the young girl's hands not being bagged at the crime scene. The record is replete with the problems with the crime scene in this case. The jury knew that, right? The jury knew some of that, yes. We now have more evidence of that, apparently. Apparently, this is the government's position that they contaminated the crime scene. Well, it was a big issue at the trial, and the judge even commented on it. It was. Yeah. It was. So we add this here to all the other evidence that there was a fight about at the trial that the defense asserted was not properly taken care of. And which this court has to consider as part of the evidence as a whole, without any deference to the jury's verdict, because that's not the standard on this appeal. Right. I'd like to talk a little bit about Mr. Britt. We heard the government talk about all these things that Mr. Britt got wrong about what he was reciting 25 years ago. What Mr. Britt was very consistent on was, I was present when Blackburn threatened Stokely. That's what he's consistent on. There is no doubt, from the material in the record, that Stokely was in Britt's custody at the courthouse. There's a picture of it in the record. So, on that sort of crucial fact, there's Blackburn says it didn't happen, and there's another person who was there, Crawley, who says that was there and it didn't happen. Crawley was another AUSA at the time. Crawley testified before the district court below. Crawley testified before the district court below that, while he was present during a meeting with Blackburn and Stokely, that Britt wasn't there. Now, Britt says in his affidavit that Crawley wasn't there. So they're talking about two different things. Exactly. If you credit both of them, they're talking about two different things. They're talking about two different meetings. And the issue we'd submit comes down to the credibility of Britt. Wasn't there some evidence that George Anderson was there, the U.S. attorney? Crawley talks about that, correct, that George Anderson was in and out. At one point. At one point during the meeting that he witnessed, correct. But the issue comes down to the credibility of what Britt says versus Blackburn's denial. And the record's replete with that for the court to make an assessment of. But I think it's unfair to Mr. Britt to say, Well, we throw everything out because he's got details of what happened 25 years ago. Wrong. Well, the weather shot he drove from South Carolina to North Carolina seems like a pretty big deal because that's when he says she confessed. And that seems like a very material fact. And what's interesting about that, Judge Harris, is look at the testimony of Mary Britt, who was Britt's wife who testified at the evidentiary hearing below. Now, she had divorced from Britt by the time of the hearing, and they were estranged. She says that Mr. Britt told her about this trip in 1979 when it happened, and that he came home and said that Stokely had made these extraordinary statements. I forget the exact term, but clearly implying that something big had happened. Then, in the early 80s. Did he tell her about the Blackburn statement? No. He then, in the early 80s, by this time they were living apart, but they had interaction, and it was during the time that a TV movie was on about this case, and Britt said to Mary Britt, talking about this meeting between the prosecutors and Stokely, that's not how it happened. I was there. That's what he told his wife then, in 1982-ish. Why in the world would he make that up? Why in the world would Britt make any of this up? Was she discredited? Did the judge discredit her? No, Your Honor. In fact, by this point, she was estranged. She had divorced Mr. Britt, and they had a contentious relationship, I believe. Isn't there pretty good evidence that he did make up the part where he picked her up in South Carolina and drove her to North Carolina? There is evidence that he didn't do that, correct. Right. That's not really disputed. There's evidence that he told his wife he did. Yeah, so it seems like maybe he's not the straightest shooter when it comes to what's going on. Well, again, why would he make that up? I don't know. Could there have been two trips? There was one trip. Was there a trip down and back? Stokely was taken, according to the government's evidence, from South Carolina to Charlotte to Raleigh. According to documentary evidence offered below, it was a straight trip from Pickens County, South Carolina to Raleigh. That was the evidence there. Charlotte wasn't involved in that. But was there a return trip? No, because she was released from the material witness warrant, and that's when she went into the hotel. When was she released? After her testimony in court. After her testimony in court, then she was retained as a potential defense witness but was released from custody. That's when she was put up in the hotel. So she was still under subpoena. Correct. But she was freed out in the community. Correct. She was not in custody anymore. All right. Several hotels. Several hotels, correct. And that's where Mr. Leonard gets the details. Because Mr. Leonard talked about her sleeping on his sofa. The first time that he had her, right. The first time that he had her. And then Mr. Leonard talks about the statements that she made to Mr. Leonard. And that, again, is part of where it comes in. The last thing I'd ask the court to consider is, which we'd submit the district court didn't consider, is the interlocking nature of all of that evidence, of what Britt says with what Rauder says, who's one of the most important witnesses. Because the district court said, well there's no explanation for why Stokely would say to Rauder those quote-unquote damn prosecutors. Well, there is. It's the threat that Britt testifies to. Well, it's a logical threat, though. I mean, why would the prosecutor, we talk about him threatening her, but if somebody comes, if somebody comes to the prosecutor and confesses to being involved in a murder, you would expect that they'd be incriminating themselves and they're going to be charged. It's not surprising that the prosecutor might say, well if you were involved in this thing, you're going to get indicted. And we would expect that it would be disclosed. That's the other problem. Is that, according to Britt, this happened and nobody said anything about it to the defense. That's the, you're absolutely right, Judge, but the flip side of that is that. It's not surprising at all that Blackburn would have said, if you were involved in the murders, you're going to end up in the penitentiary yourself. And why would that have to be disclosed? He said if you testify, according to Britt, if you testify that you were there, you're going to get prosecuted. What's wrong with that for a prosecutor to say that? It's absolute truth. It's exactly what should happen. But if the person says to the prosecutor, I was there, that should be disclosed. Under what theory? Brady. Correct. Brady. Correct. I mean, I think that's basic Brady. She's saying she was there at the time of the murders. They know the theory of the case is that Dr. McDonald was saying that this woman and three men are there committing murders. But there's like six other people saying she confessed too. So the theory is this one really counts because she said it to a prosecutor. It's not just cumulative. Correct. Because, I mean, that would, I assume, be part of the argument. Well, everybody knows she's running around. That's part of the government's argument. Correct. But this is different. Absolutely. Because it's to a prosecutor. Yes. Thank you. We'd ask the court to reverse. Thank you very much. Thank you very much. We will come down and see a lot of lawyers.
judges: Diana Gribbon Motz, Robert B. King, Pamela A. Harris